[Civ. No. 7176. First Appellate District, Division Two.—June 17, 1930.]

F. VALDICK, Appellant, v. S. D. LeCLAIR et al., Respondents.

A. MADSEN, Appellant, v. S. D. LeCLAIR et al., Respondents.

Cooley, Crowley & Gallagher for Appellant.

Barry J. Colding and Theodore Hale for Respondents.

PRESTON (H. L.), J., *pro tem.*—The above-entitled actions are for personal injuries. They were consolidated in the trial court and tried before a jury. At the conclusion of the evidence the court directed a verdict in favor of the

defendant S. D. LeClair. From the judgment entered upon this verdict the plaintiffs prosecute this appeal.

The undisputed facts are briefly these: On the day of the accident in which plaintiffs and appellants were injured, they were employees of one J. A. Bryant, a contractor, who was at the time erecting a concrete structure in Golden Gate Park, San Francisco, known as the "Kezar Stadium." In raising concrete to workmen above the ground level, an elevator and hoist was used. The mixed concrete was contained in large steel wheel-barrows, called by concrete workers "buggies." These "buggies" were placed upon a platform, called an elevator or cage, and raised from the ground, one or two at a time, by the hoist to the level of a runway about thirty feet above the ground. As appellants stepped from this runway on to the floor of the elevator, each to remove a "buggy," the elevator fell, precipitating them to the ground and causing the injuries to appellants upon which these two actions are predicated. The elevator upon which the "buggies" were resting when it fell, together with the guides which support it, was owned by the said contractor, J. A. Bryant. The defendant and respondent, S. D. LeClair, had rented or hired to Bryant a Fordson tractor, equipped with a hoisting attachment of the drum and cable type, known as "Herschted Hoist." With this Fordson tractor and hoist attachment, respondent LeClair furnished an operator, one Arthur M. Pratt. The hoisting apparatus was built to raise from one thousand to fifteen hundred pounds. This was less than the weight of two loaded "buggies," which weighed approximately nine hundred pounds each. When the accident occurred, the elevator cage was being held aloft by the brake of the hoist. The brake on this hoist is set or locked by a "Woodruff Key," which is a steel wedge or cotter pin, inserted in a slot of a steel rod or shaft. When the brake is locked or "set," this key is engaged by a slot in the bushing of the brake or shaft. The weight of two filled concrete "buggies," plus the added weight of the apparatus and appellants, when they stepped on the floor of the elevator to remove the "buggies," caused the "Woodruff Key" to shear off, releasing the brake and precipitating the elevator with appellants and the two loaded concrete "buggies" to the ground.

The complaint charges that the defendant (LeClair) so carelessly and negligently managed and controlled said hoisting engine and said hoisting apparatus that plaintiffs, Valdick and Madsen, were thrown from a height of approximately thirty feet above the ground to the surface of the ground, and as the proximate result thereof sustained serious bodily injuries. LeClair, in his answer, denies any negligence on his part, and charges contributory negligence on the part of plaintiffs.

The principal controversy seems to be over the "status of Pratt," the operator of the hoist, at the time of the accident; or, in other words, was Pratt in the employ and under the control of Bryant, the contractor, or LeClair, the owner of the Fordson tractor and hoist, or partially in the employ and under the direction and control of both?

LeClair had been for thirty years prior to the accident a "hoisting contractor," that is, in the business of renting or hiring, hoisting engines, machinery and apparatuses to other contractors. With each equipment hired or rented, LeClair would furnish an operator known as a "hoisting engineer"; his office, machine-shops and yards were in San Francisco, and he owned and operated some thirty-five hoisting outfits; he had a number of men in his employ, some of them were mechanics, whose duty was to keep the machinery and equipment in repair; others were known as "hoisting engineers," whose duty was to operate the hoisting equipment in any work in which LeClair's machinery was used. Pratt was a "hoisting engineer" and had been in the employ of LeClair for about fourteen years immediately prior to the accident; at the time of the accident he was receiving for his services eight dollars per day and was paid by LeClair, who in turn charged Bryant, the contractor, eighteen dollars per day for the use of the Fordson tractor, hoist and equipment, and the services of Pratt.

Bryant did not testify in the case, but his foreman, Mr. Jack Haglund, testified in part as follows: "Q. Under whose supervision did he (A. M. Pratt) go to work—as to what time he started, and what time he stopped? Who had control of him? A. Well, he came in with the concrete gang; he naturally had to comply with our working time, or hours, on the concrete gang. Q. Well, who had supervision of him when he was out on your lot? A. I did.

Q. You had charge of the man that operated the hoist, and all other men working there, is that right? A. To a certain extent he would be under our charge. He had to comply with our working hours, and had to comply with our mode of working up above to see there was no tie-up, but so far as being in direct charge, taking particular orders, or orders so far as taking care of his mechanical appliance that he had, we couldn't give any. That is why we had a hoisting engineer. . . . If he was doing something that was detrimental to the well-being of our business, I could kick him off the job; that was one thing; he was that much under my supervision. If he was doing something that was radically wrong, he could be kicked off the job. . . . Q. Did you regulate the hours or the days that he would come to work for you? A. Yes. He was to be there whenever we had concrete hoisting to do, and I made a point to tell LeClair the day before to be sure and have a man there. . . . Q. Now, who installed the hoist? A. We built the tower and built the platform; LeClair's men set up the hoist, run the cable through, and made the connections. . . . Q. Now, who told the operator of the hoist when to shoot it up or to lower it? A. He was to use his judgment, the same as hoist men do; he was to take it up when he saw it loaded and take it down when it was unloaded, and he made a special point to have the hoist in plain sight all the time. . . . Q. I understand that, but so far as the sending up or lowering of this hoist, who directed him to do that? Who was he under for that. . . . If he was under anybody? A. No, he was not under anybody so far as getting signals for taking that hoist up or down. Q. He could lower or raise it whenever he wanted to, whether there was anything on it or not? A. Absolutely, he could. . . . Q. Was his position any different than anybody else there? A. Yes. Q. How was his position different? A. Well, the other men were under our direct control. We could hire and fire the other men and pay them off. When we hired them and paid them off we were done with their services, whereas with him I just merely told him 'You go on back to LeClair's, or, 'We haven't any hoisting for you tomorrow,' or whenever I wanted to see him again. I never called the man myself. I called LeClair, and I would say, 'We are pouring concrete tomorrow, and have a man out

there.' I wasn't demanding that particular man. I just called Mr. LeClair's office and said, 'Have a man out here for hoisting' and that is where the difference is. . . . *I had absolutely no authority to fire him."*

The witness Warren S. McMains, office manager for S. D. LeClair, testified in part as follows: "Q. This book shows the time for the week ending June 16, 1928? A. Correct. Q. And these are the employees of Mr. LeClair for that week? A. They are. Q. Does there appear in that book an employee by the name of Pratt, for that week? A. Yes, sir. . . . Q. Is that A. M. Pratt, a hoisting engineer? A. It is. . . . Mr. Gallagher (reading from the time-book): Week ending June 16th, 1928. In that appears the name of Pratt, Monday, 8 hours; Tuesday, 8 hours; Wednesday, 8 hours; Thursday, 8 hours; Friday, the 15th, 8 hours; Saturday, the 16th, 4 hours. . . . Q. Was any arrangement made as to the price that you were to charge Bryant? A. Yes, it was understood that it was to be $18 a day, and we were to furnish the tractor and a man, and the necessary equipment at the rate of $18 a day. The Court: The man to be furnished for what purpose? What was the man to do? A. To operate the tractor. The Court: Yes; all right. Mr. Hale: Q. A man is always furnished? A. That is always understood, yes; the man is furnished. Q. In your dealings with these contractors, you furnished a man with the tractor? A. We do, yes. . . . Q. Mr. LeClair furnished the gasoline and oil used by this tractor, didn't he? A. Yes, sir."

Arthur M. Pratt testified, in part as follows: "Q. Mr. Pratt, what is your business? A. Engineer. Q. By whom are you employed? A. *S. D. LeClair.* Q. How long have you been so employed? A. For LeClair, about twelve or fourteen years. Q. Steadily? A. Steadily, yes, sir. Q. In that employment, I assume you receive monthly wages, but I will not ask you how much? A. No, sir; daily wages. Q. Daily wages. Aren't you a hoisting engineer? A. Yes, sir. Q. Are you familiar with a certain hoisting apparatus that was being used at Kezar Stadium on June 15th, 1928? A. I should be; I happened to run it for about five years. Q. You say you ran it for about five years that identical hoisting machine involved in the accident—is that the one you ran for five years? A. It was. . . . Q. From whom

did you take your orders, while you were working on that job? A. Mr. Haglund. . . . Q. When you say that you took your orders from Mr. Haglund, do you mean by that you took his direction when to hoist and when not to hoist? A. No, sir. Q. State what Haglund told you, state everything Haglund told you about it? A. He said, 'We are ready to pour concrete.' I said, 'What time do we have to be ready?' and he said '8 o'clock.' That is all that is necessary for him to say, when they placed the buggies on the elevator I took them up. Q. Is that all the conversation? A. It was. Q. That is what you meant when you said you took orders from Mr. Haglund? A. Yes, sir. . . . Q. Operating this Fordson tractor, drum and so forth, did you do that yourself? A. Yes, sir. Q. Nobody told you what to do about that? A. No, sir."

The appellants contend that the court erred in directing a verdict in favor of defendant, for the reason that the evidence supports the following inferences of fact: "(1) That Arthur M. Pratt was the servant of the defendant, S. D. LeClair, at the time the plaintiffs received the injuries complained of, and that he was at said time acting within the scope of his employment; (2) That the proximate cause of the falling of the hoist or elevator cage was the fact that the load which said Arthur M. Pratt attempted to lift with S. D. LeClair's hoisting apparatus was far beyond the capacity of said hoisting engine, and braking equipment attached thereto, to hoist or hold, and that said Arthur M. Pratt knew before he hoisted said load just exactly what the plaintiffs would do in all probability, and that it was not safe to use the Fordson tractor and the braking apparatus attached thereto because of said lack of capacity."

Respondent, on the other hand, contends that Pratt, at the time of the accident, was the agent and employee of Bryant, and if Pratt was negligent, his negligence would be imputed to Bryant and not to LeClair. This seems, also, to have been the opinion of the trial court, and the reason given by it for directing a verdict in defendant's favor.

The rule is recognized in this state that a servant may be loaned by his master to another so that the act done by the servant becomes the act of the master to whom he has been loaned and for the time being the general master

is not responsible for his acts. (*Burns* v. *Jackson*, 59 Cal. App. 662 [211 Pac. 821]; *Pruitt* v. *Industrial Acc. Com.*, 189 Cal. 459 [209 Pac. 31]; *Billig* v. *Southern Pac. Co.*, 189 Cal. 477–483 [209 Pac. 241]; *Moss* v. *Chronicle Publishing Co.*, 201 Cal. 610–616 [55 A. L. R. 1258, 258 Pac. 88, 91].) This rule, however, is only applicable in cases *where the power of control exists in the special master; that is, where the original master resigns full control over the servant for the time being.* (*Moss* v. *Chronicle Pub. Co.*, *supra; Flori* v. *Dolph*, (Mo.) 192 S. W. 949; *Billig* v. *Southern Pac. Co.*, *supra*.) The power of control does not exist in a situation where the special employer has no voice in the selection or retention of the negligent employee, nor where the negligent employee is *partially under the control of the special master.* (*Billig* v. *Southern Pac. Co.*, *supra; DuPratt* v. *Lick*, 38 Cal. 691; *Higham* v. *Waterman*, 32 R. I. 578 [80 Atl. 178]; *Quinn* v. *Complete Elec. Const. Co.*, 46 Fed. 506.)

In 39 Corpus Juris, page 1275, section 1462, the rule is stated as follows: "To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation."

From *Moss* v. *Chronicle Pub. Co.*, *supra*, we quote: "A familiar illustration of the lack of full control is found in the case of *Chamberlain* v. *Lee*, 148 Tenn. 637 [257 S. W. 415–417]. There the servant of an independent contractor went to the building of another master to repair the elevator. There the operator of the elevator, the servant of the owners of the building, was told to operate the cage in such way and manner as he might be directed by the servant of the independent contractor. In manipulating the elevator, the latter servant was injured. The owners of the building were held liable upon the ground that, although their servant was directed to place himself for certain purposes under the control of the independent contractor, nevertheless their control over said servant was not completely resigned, and the cause of action by the employee of the independent contractor against them was sustained,

the court saying: 'This does not make out a case of lending a servant. The servant was put under the control of plaintiff for one purpose alone. That is, to move the car up and down as plaintiff desired while the particular job was being done. The elevator car was put under the control of the plaintiff for the time, but it was put under his control along with its attendant who remained in the service of the defendants. There is nothing to show that plaintiff could have discharged this boy, and put another boy to running the elevator at this time. Plaintiff certainly had no right to use this elevator boy for any purpose in connection with the work other than running the elevator up and down. The plaintiff could not have required the elevator boy to remain on duty for a longer period than his regular hours under his contract with defendants. In order to escape responsibility for the negligence of his servant on the theory that the servant has been loaned, the *original master must resign full control of the servant for the time being.*' "

We are of the opinion that the testimony is susceptible of the inference that the work of hoisting or raising the concrete "buggies" to the workmen on the stadium was being done by respondent LeClair through his employee, Arthur M. Pratt; that the jury might well have concluded, without abusing the discretion vested in it as the trier of the facts, that LeClair at no time had surrendered full control over Pratt to Bryant, nor had Bryant exercised that degree of control over Pratt which would establish the relation of *special employer and employee between Pratt and Bryant*, but LeClair had himself retained the right to control Pratt; Bryant merely, through his foreman, giving Pratt directions as to the details of the work and the manner of doing it.

Respondent lays great stress upon the fact that Pratt was subject to the orders of Haglund, the foreman for Bryant. The fact that one servant may have taken orders as to the details of the work from the servant of the other employer would not affect the rule above announced.

In 39 Corpus Juris, page 1275, it is said: "A servant of one employer does not become the servant of another for whom the work is performed merely because the latter

points out the work to the servant, or gives him signals calling the service into activity, or gives him directions as to the details of the work and the manner of doing it.'' (*Moss* v. *Chronicle Pub. Co., supra; Quinby Co.* v. *Estey,* 221 Mass. 56 [108 N. E. 908]; *McNamara* v. *Leipzig,* 227 N. Y. 291 [8 A. L. R. 480, 125 N. E. 244]; *Flori* v. *Dolph, supra.*)

Therefore, the evidence in the record being sufficient to support a finding that at the time of the accident *LeClair had not resigned full control of Pratt,* it follows that LeClair could be held liable for damages, if Pratt was negligent and his negligence was the proximate cause of the injuries which appellants received. (*Stewart* v. *California Imp. Co.,* 131 Cal. 125–129 [52 L. R. A. 205, 63 Pac. 177, 724].) The question of Pratt's negligence was a question of fact for the jury to determine from all the evidence in the case. ■ Where the facts were clear and undisputed, and the dictates of common prudence pointed to only one reasonable conclusion, the question was then, and only then, one of law for the court. (*Moss* v. *H. R. Boynton Co.,* 44 Cal. App. 476 [186 Pac. 631]; *Chrissinger* v. *Southern Pac. Co.,* 169 Cal. 619 [149 Pac. 175]; *Wing* v. *Kishi,* 92 Cal. App. 495 [268 Pac. 483]; *Monroe* v. *Switzer et al.,* 91 Cal. App. 364–368 [267 Pac. 125]; *Smith* v. *Associated Oil Co.,* 53 Cal. App. 143 [199 Pac. 879].)

We think the jury might well have found from the testimony of Pratt alone that the falling of the hoist and elevator was due to the fact that Pratt attempted to lift, with LeClair's hoisting apparatus, a load that he knew was far beyond the capacity of said hoisting equipment to hoist and hold safely; that he also knew, before he lifted the overload, that appellants would have to step on the elevator floor to remove the concrete ''buggies,'' thereby placing additional weight on the elevator and greater strain on the hoisting apparatus. If the jury found these facts to be true, it could not be doubted that Pratt was guilty of negligence, and that such negligence was the proximate cause of plaintiffs' injuries. We find no evidence whatever of any contributory negligence on the part of appellants.

■ The law is, of course, well settled that the court may withdraw the case from the jury and direct a verdict in favor of either party, where the evidence is undisputed,

or is of such a conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set a contrary verdict aside as unsupported by the evidence. (*Davis* v. *California St. C. R. R. Co.*, 105 Cal. 131 [38 Pac. 647]; *Estate of Baldwin*, 162 Cal. 471 [123 Pac. 267]; *Diamond* v. *Weyerhaeuser*, 178 Cal. 540 [174 Pac. 38]; *Burgesser* v. *Bullock's*, 190 Cal. 673–683 [214 Pac. 649]; *Stephenson* v. *The Southern Pac. Co.*, 102 Cal. 143 [34 Pac. 618, 36 Pac. 407]; 24 Cal. Jur. 916, 917; *Umsted* v. *Scofield Eng. Const. Co.*, 203 Cal. 224–228 [263 Pac. 799]; *Wayland* v. *Latham*, 89 Cal. App. 59 [264 Pac. 766]; *Jensen* v. *Sprigg*, 84 Cal. App. 522 [258 Pac. 683]; *McCarthy* v. *Pacific Elec. Ry. Co.*, 82 Cal. App. 503–508 [255 Pac. 868].) But it is equally well established by the foregoing authorities, and many others that could be cited, *that a directed verdict in favor of a defendant is unauthorized where there is substantial evidence,* as we find exists in the case at bar, *tending to prove in favor of plaintiff all of the controverted facts necessary to establish his case.*

It follows from what has been said that we are of the opinion that Pratt's status at the time of the accident, that is, whether he was the servant of LeClair or Bryant, and also whether or not he was negligent, were both questions of fact which should have been submitted to the jury for its determination, under proper instructions from the court.

The judgments are therefore reversed.

Sturtevant, J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 15, 1930, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 11, 1930.