[Civ. No. 8348.   First Appellate District, Division One.—August 19, 1932.]

A. MADSEN, Respondent, v. S. D. LeCLAIR, Appellant.

F. VALDICK, Respondent, v. S. D. LeCLAIR, Appellant.

Barry J. Colding, Theodore Hale and Carroll B. Crawford for Appellant.

Cooley, Crowley & Gallagher and Cooley, Crowley & Supple for Respondents.

LAMBERSON, J., *pro tem.*—We have before us two appeals of the defendant S. D. LeClair, which have, by stipulation of the parties, been consolidated and presented in a single record. Each of the plaintiffs sued defendant for damages for personal injuries suffered as a result of the falling of a construction elevator cage used in the hoisting of building materials and equipment going into the construction of a concrete structure known as Kezar Stadium in Golden Gate Park, in San Francisco. The trial, which has resulted in this appeal, was the second trial of the case, and was had before the court without a jury. In the former trial, with a jury, the court directed a verdict in favor of the defendant. Upon an appeal the judgment was reversed. (*Valdick* v. *LeClair*, 106 Cal. App. 489 [289 Pac. 673].) Upon a second trial the court gave judgment in favor of the plaintiff F. Valdick in the sum of $2,050, and in favor of the plaintiff A. Madsen in the sum of $3,000. The appeal is from each judgment.

At the beginning of the second trial counsel agreed by stipulation that certain facts, as set forth in the opinion of the court in *Valdick* v. *LeClair, supra,* were established. We consider it advisable for the purposes of this opinion to restate the facts, because the testimony, as it was developed at the second trial, varied in some particulars from that given at the first trial. The facts, in substance, were as follows:

J. A. Bryant was a general contractor who had secured a contract for the erection of the Kezar Stadium. During the progress of the work, it being necessary for the carrying on of the work that hoisting machinery be used, Bryant went to the appellant, who was a hoisting engineer, and had been engaged in the business of renting hoisting machinery and engines of various types, and supplying operators for the same for many years. Bryant told

LeClair of his contract and of his requirements. According to the testimony of LeClair, he asked Bryant if the latter wanted a small steam engine, and Bryant replied that he did not want such an engine, because it would be necessary to move the machinery several times, and as the ground was rough, he would like to have a tractor. In describing his requirements, Bryant stated that he desired to run a cage or elevator platform of a size large enough to accommodate two buggies, which are large steel wheelbarrows used for carrying concrete from the trucks to the places where it is poured into the walls under construction. Appellant told Bryant that a tractor was not large enough to handle two loaded buggies on a single line. The latter then said that he intended to hoist one buggy loaded, and allow enough room on the platform for the placing of an empty buggy which could be lowered, presumably, while the loaded buggy was being emptied, thus allowing the loading and unloading to be a continuous operation. It was agreed that Bryant should pay $18 per day to the appellant for the use of the engine and hoisting apparatus, including $8 as wages for an operator to be provided by LeClair. On the following day, pursuant to agreement, a representative of LeClair went out to the Stadium, and in a talk with Bryant's foreman it was agreed that a cage large enough for two buggies should be used. The foreman wanted to use a single line running from the center of the cage, and appellant's representative suggested that because of a loaded buggy being carried on one side of the cage, the cage would tip or rack, and that in order to remedy such defect he would furnish with the hoisting apparatus a device known as a bridle. Shortly thereafter this representative of LeClair personally delivered at the scene of work a Fordson tractor with a hoisting apparatus of the drum and cable type, known as an Ellison hoist, adjusted thereto. This equipment was delivered at a point about 200 feet from the elevator tower which was in process of erection, and with which the hoisting apparatus was to be used. Three or four days later, upon notification from Bryant or his foreman, LeClair's representative telephoned to one of their hoisting engineers, a man named Pratt, who had been employed by LeClair for at least 14 years, to report for work on the following morning to Bryant's foreman, and to take

his orders from Bryant or the foreman. On the following day Pratt reported to the foreman about 8 o'clock in the morning, and was told that they were not ready to pour, but to get the tractor warmed up and ready for work. In the time intervening between delivery of the engine and hoist to the scene of the work, and the morning on which Pratt had reported for work, the hoisting engine and hoist had been moved to a position near the tower, and rigged up for work. LeClair's representative testified that the work of rigging up the hoist had not been done by anyone connected with LeClair's establishment. Pratt examined the engine, and warmed it up for work, and during the morning hoisted some equipment for Bryant's foreman. About 11 A. M. he was informed that they were ready to hoist concrete. Two loaded buggies were run on to the cage and hoisted to the level of a runway where the respondents, who were employees of Bryant, were stationed with orders to take the buggies off of the cage. There is some conflict in the testimony as to whether or not Pratt made objection to Bryant or his foreman that the load was too great for the hoist. As the respondents stepped forward to pull the buggies off of the cage they each placed a foot on the cage and pulled on the buggies. Thereupon the cage fell, and each of the respondents was precipitated to the ground a distance of about 14 feet, receiving the injuries which form the basis of the action. It was later found that the excessive weight had sheared off a contrivance known as a "Woodruff key", which is a steel wedge or cotter pin inserted in a slot of a steel rod or shaft, and which was a part of the braking apparatus of the hoist, thereby permitting the cage to fall.

Pratt continued to work on the job for some days after the accident. When concrete was not to be poured, he would be told by the Bryant foreman that he would not be needed the following day, and when concrete was to be poured, the foreman would notify LeClair's office, and someone at that place would notify Pratt to report on the job. Pratt received his wages from LeClair at the rate of $8 per day, and frequently worked overtime at the request of Bryant's foreman. All of his wages were paid by LeClair, who also furnished gasoline and oil with the tractor. The trial court found in each case as follows: "Shortly

prior to June 15, 1928, the defendant S. D. LeClair, a hoisting contractor, entered into an agreement with the said J. A. Bryant, and pursuant to said agreement, the defendant S. D. LeClair agreed to and did furnish to said J. A. Bryant for hire a certain hoisting engine and apparatus, owned by the said defendant, together with a hoisting engineer in the employ of said defendant, to operate the same, in the construction of said Kezar Stadium; the said defendant S. D. LeClair, by and through his said employee and hoisting engineer, operated and controlled said hoisting engine and apparatus in the construction of said Kezar Stadium on said 15th day of June, 1928; the said employee and hoisting engineer of said defendant was not, at said time and place, a servant or employee of the said J. A. Bryant but, in the operation and control of said hoisting engine and apparatus, was and remained the employee and servant of said defendant, acting within the course and scope of his employment by, and under the control of, the defendant S. D. LeClair.''

The facts, as developed in the second trial of the case, do not differ materially from those adduced during the first trial. We have already related such additional matters which seem or tend to explain the relation which Pratt bore respectively to Bryant and to appellant. The solution of the controversy depends, as it did in the former appeal, upon the status of Pratt, who had worked for LeClair for a long period of time. No one in the employ of Bryant directed Pratt as to the care or operation of the motor or hoist. Even Pratt said that no signals or directions were actually given as to when to hoist, but he watched the men, or the placing of the buggies on the cage, and it was customary for the engineer to use his own judgment as to when the cage was ready to go. He further testified that he knew the two buggies weighed 900 pounds each, and that the capacity of the hoist, as it was rigged, was about 1500 pounds.

The court upon the former appeal (*Valdick* v. *LeClair*, *supra*) said at page 497: ''We are of the opinion that the testimony is susceptible of the inference that the work of hoisting or raising the concrete 'buggies' to the workmen on the stadium was being done by respondent LeClair through his employee, Arthur M. Pratt; that the jury might

well have concluded, without abusing the discretion vested in it as the trier of the facts, that LeClair at no time had surrendered full control over Pratt to Bryant, nor had Bryant exercised that degree of control over Pratt which would establish the relation of *special employer and employee between Pratt and Bryant*, but LeClair had himself retained the right to control Pratt; Bryant merely, through his foreman, giving Pratt directions as to the details of the work and the manner of doing it."

Upon the question as to the correctness of the trial court's order granting a motion for a directed verdict, the court said in substance that the evidence in the record being sufficient to support a finding that at the time of the accident LeClair had not resigned full control of Pratt, it followed that LeClair would be liable for damages if Pratt was negligent, and his negligence was the proximate cause of the injuries received by the plaintiffs, and the question of Pratt's negligence was a question of fact for the jury, to be determined from all the evidence, and held that only when the facts are clear and undisputed, and the dictates of common prudence point to only one reasonable conclusion, the question is then, and only then, one of law for the court.

Respondents urge that the conclusions of the court on the former appeal became the law of the case. The conclusion of the court that the question as to the control of Pratt, and as to his negligence, were questions of fact for the jury to determine, did become the law of the case.

Where the appellate court has, in its opinion, stated a rule or principle of law necessary to a decision, that rule or principle must be adhered to and observed throughout the subsequent progress of the case, both in the lower court and upon subsequent appeals, although it may be believed upon further consideration that the former decision in that particular was erroneous. (*Burns* v. *Jackson*, 53 Cal. App. 345 [200 Pac. 80], citing *Westerfield* v. *New York L. Ins. Co.*, 157 Cal. 339 [107 Pac. 699].) This doctrine does not, however, extend without exception to questions of fact. In *Wallace* v. *Sisson*, 114 Cal. 42 [45 Pac. 1000, 1001], cited with approval in *Allen* v. *Bryant*, 155 Cal. 256 [100 Pac. 704], the court said: "But, when the fact which is to be decided depends upon the credit to be given to the

witnesses whose testimony is received, or the weight to which their testimony is entitled, or the inferences of fact that are to be drawn from the evidence, the sufficiency of the evidence to justify the decision must be determined by the tribunal before which it is presented, and is not controlled by an opinion of the appellate court that similar evidence at a former trial of the cause was insufficient to justify a similar decision . . . and if, in the opinion which it renders, it assumes that the evidence sustains any fact, it is only the opinion of the court, and not a finding of that fact." In *Allen* v. *Bryant, supra,* the court said that the doctrine of law of the case is rarely, and in a very limited class of cases, applied to matters of evidence as distinguished from rulings of law.

█ We must conclude, therefore, that the questions of fact as to whether Pratt was the servant of appellant rather than Bryant, and as to whether the negligence of Pratt as the employee of appellant was the proximate cause of the injury to the respondents, were still to be determined by the trial court upon the second trial, and the problem here to decide is the sufficiency of the evidence to support the findings of the trial court.

An excellent analysis and carefully considered review of the California cases involving the question which we have before us in this case is found in the case of *Peters* v. *United Studios, Inc.,* 98 Cal. App. 373 [277 Pac. 156, 157]. In that case, Daum, a tractor driver in the employ of United Studios, Inc., was sent with the tractor by his foreman to the Christie Studios, with instructions to go over to the Christie Studios to do whatever they wanted done over there. The United Studios rented the tractor and furnished Daum as the driver. Oil and gas were furnished by the Christie Studios. Daum reported to the foreman of the latter, and thereafter the tractor was taken to Wilmington, where it was used in filming certain scenes of a motion picture. The Christie Studios people attached two angle-irons to the front of the tractor, and on one occasion the tractor was driven for a short time by one of the Christie actors. On other occasions Daum was furnished costumes and doubled for the actors, while on other occasions he wore his own working clothes, and was not made up. The Christie foreman told Daum what to do, but did not under-

take to interfere with the mechanical operation of the tractor. Daum knew nothing about the contract, but turned in his time to the United Studios people, and during the time that the tractor was used by the Christie people the United Studios had nothing to do with the operation of the machine and in no way interfered with the operation of the machine. Judgment was rendered upon a verdict against the defendants, United Studios, and the operator of the tractor, for injuries received by an actor employed by Christie Studios, who was injured while the tractor was being operated by Daum in the filming of a picture.

At the trial of the case the court instructed the jury as follows: " 'You are instructed that, as a matter of law and as a matter of fact, the defendant Kenneth Daum, in driving, management and operation of the tractor that struck the plaintiff on the occasion involved here, was the agent and servant of the defendant, United Studios, Incorporated, and any act of negligence, if any, on his part, was the act of negligence of said defendant corporation as well as his own.' "

In holding that the trial court erred in giving such an instruction the appellate court said: "The question is, again, not what control was actually exercised, but who had the authoritative right to control. The fact that the terms of the contract of hiring were not conclusively proved left it, in our judgment, to the jury to determine from all the evidence who at the time and place of the injury had the right to exercise exclusive direction and control of the conduct of Daum. In the last analysis the question really depends on the construction to be given to the direction of Daum to 'do whatever they want done' in the light of all the proved circumstances in the case. That was peculiarly a fact to be determined by the jury and should not have been taken from them. We conclude, therefore, that the court erred in instructing the jury as a matter of law that appellant, United Studios, Inc., was liable for the negligence of Daum. We likewise conclude that under the evidence in this case the question whether or not Daum remained subject to the control of United Studios, Inc., so as to render them liable for his negligence should have been left to the jury to decide under appropriate instructions by the court."

The case of *Umsted* v. *Scofield Eng. Const. Co.,* 203 Cal.

224 [263 Pac. 799, 801], was another case where the employee of the general employer was instructed to go over to the special employer's job and do " 'anything they wanted to take care of' " or "do whatever was needed". On the job the construction superintendent of the special employer had directed the employee, Umsted, as to what was to be done, but not as to how to do anything. The Supreme Court said that the jury might have inferred that the instructions given by the representative of the construction company, the special employer, were merely directions as to the result to be accomplished, such as are required in the nature of things to be given to independent contractors in any case.

On appeal, all conflicts in the evidence must be resolved in favor of the judgment, and all reasonable inferences from the evidence will be drawn in its support. (*Witherow* v. *United American Ins. Co.*, 101 Cal. App. 334 [281 Pac. 668].)

While we are of the opinion that some of the cases relied upon by respondent are to be distinguished from the case before us, particularly the case of *Moss* v. *Chronicle Pub. Co.*, 201 Cal. 610 [55 A. L. R. 1258, 258 Pac. 88], in which the employees involved were engaged in doing work for the mutual benefit of their respective employers, and the case of *Billig* v. *Southern Pac. Co.*, 189 Cal. 477 [209 Pac. 241], in which the employee of the general contractor was controlled during the greater part of the time by the general employer, and was beyond the control of the special employer for long periods of time, we must nevertheless conclude that the question of whether Pratt was actually under the control of Bryant to such an extent as to absolve the appellant of responsibility for the negligence of Pratt, as well as the question of whether or not Pratt's negligence was the proximate cause of the injury to respondents, was a question of fact to be determined by the court, and that its findings cannot be disturbed.

It would be idle to review the California authorities, because they have been set out very fully in several decisions, and particularly in *Peters* v. *United Studios, Inc., supra.* The cases have gone far in supporting the principle that to escape liability the original master must resign full con-

trol for the time being, it not being sufficient that the servant is partially under the control of a third person; and that it is necessary to distinguish between authoritative direction and control, and mere suggestions as to details, or the necessary co-operation where the work furnished is part of a larger operation.

It is ordered that the judgment be affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 17, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 17, 1932.