[Civ. No. 11576. Fourth Dist., Div. Two. July 28,.1972.]

OLIVER STRAIT, Plaintiff and Respondent, v.
HALE CONSTRUCTION COMPANY et al., Defendants and Appellants.

TOPHAM & SONS, Plaintiff and Respondent, v.
WILLIAM E. YOUNG, JR., et al., Defendants and Appellants.

(Consolidated Cases.)

COUNSEL

Wilson, Borror & Dunn, William H. Wilson, Thompson & Colegate, Bruce Morgan and Frederick J. Lower, Jr., for Defendants and Appellants.

Thomas T. Anderson and Jack Boggust for Plaintiffs and Respondents.

OPINION

KERRIGAN, J.—Two lawsuits were filed against three defendants as a result of a collision between a tractor (earthmover) and a truck on September 6, 1966, at the intersection of Route 115 and Allbright Street in

the County of Imperial. The truck driver (Oliver Strait) was seriously injured in the collision and sued to recover damages for his injuries. The truck owner (Topham & Sons, a corporation) sued for the property damage to its truck. The earthmover was owned by a farmer (William E. Young, Jr.) and was being operated by his employee (Miguel Hurtado). Young had let the tractor and the operator (Hurtado) to a road construction firm (Hale Construction Company, a co-partnership). At the time of the accident, the road builder (Hale) was converting Allbright Street from a dirt road to a paved street.

The two actions against the farmer, the tractor operator and road builder (Young, Hurtado and Hale) were consolidated for trial. The jury awarded the truck driver $225,700 and the truck owner $8,603 against all defendants. This appeal ensued.

Negligence, contributory negligence, proximate cause and damages are *not* issues on appeal. The crucial problem involves the vicarious liability, if any, of the general employer (Young) and the special employer (Hale) for the negligence of the borrowed servant (Hurtado). The general employer claims that the court erred in instructing the jury as a matter of law that he was liable for the loaned servant's negligence. The special employer claims that the trial court erred in denying its motions for nonsuit, directed verdict and judgment notwithstanding the verdict and in leaving the issue of vicarious liability to the jury.[1]

We hold that where a general employer loans out a tractor and an operator to a special employer to assist in the construction of a public road, and where personal injury and property damage ensue to third parties as a result of the negligence of the loaned servant in the operation of the tractor, both the general employer and the special employer are liable for the tort of the borrowed servant.

In reaching the foregoing conclusion, it is necessary to review the factual background of these lawsuits as well as the law governing the liability of a general and special employer for the negligence of a loaned servant.

Hale Construction Company is a firm specializing in road and airport work. It entered into a contract with the County of Imperial and the federal government to do the work on Allbright Street. The job consisted of preparing Allbright Street for eventual hardtop surfacing. This required excavating dirt from some areas and building-up other areas which, in

---

[1]The special employer (Hale) also contends the court erred in refusing three proffered instructions but in view of our resolution of the main issues, a discussion of the claimed error becomes moot.

turn, required the use of earthmoving machines commonly called *rigs*. The work on Allbright Street was to be accomplished east and west of its intersection with Route 115.

After the road firm undertook the Allbright Street job, it found it was falling behind in its work schedule. Hale was under a completion deadline with a penalty of $100 per day. Initially, Hale had the use of three John Deere 50-10 tractors (earthmovers or rigs). One was owned by Hale and operated by its own employee. The other two were rented, with the operators being provided by the equipment owners. Someone told Hale that Young owned a 50-10 tractor. To accelerate construction, Hale contacted Young about letting the rig with an operator.

Young is a farmer living near Calipatria in Imperial County. He uses the earthmover in connection with his extensive farming operations. He had never leased out the rig or operator prior to being contacted by the road builder. Inasmuch as the machine was not then being utilized in farming operations, he agreed to rent the rig and supply Hurtado as the operator for $18 an hour. Young was to pay Hurtado $5 an hour to operate the rig from the $18 hourly rental.[2]

Hurtado and the earthmover went on the construction job, worked for two weeks, and were temporarily terminated. A day or two before the accident, Hale again called Young and requested that Hurtado return with the rig to the job site.

In addition to a construction superintendent, the Allbright Street job was under the direct supervision of Raymond Hale, a general partner and officer of Hale Construction Company. Hale had a grade checker located at the place where the dirt was to be removed by the various tractor operators, as well as a dump boy at the site where the dirt was to be deposited by them. The grade checker would tell the rig operators where to cut and how deep to cut and the dump boy instructed them where and how to deposit the removed dirt. In removing and dumping the earth, it was necessary for the rigs to cross Route 115—a through highway—where it intersects with Allbright. Entrances to the highway on both sides of Allbright were posted with stop signs. In hauling dirt from a removal point west of the intersection to the dumpsite at a point east of the intersection, Hurtado collided with the truck being driven by Strait and owned by Topham & Sons which was proceeding north on Route 115.

Turning to the legal aspects of the two lawsuits, cases involving the

---

[2] The evidence is conflicting as to whether the farmer (Young) or the paving firm (Hale) furnished the gas for this particular rig, but such evidence is not significant to our decision.

application of the *loaned servant rule* have not always been uniform in the results obtained. This observation is not new or novel. In 1928, an illustrious jurist came to the same conclusion when he wrote: "The law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence. No lawyer can say with assurance in any given situation when one employment ends and the other begins. The wrong choice of defendants is often made, with instances, all too many, in which justice has miscarried." (Cardozo, *A Ministry of Justice* (1921) 35 Harv.L.Rev. 113, 121.) The passage of time has not eliminated the confusion. Courts have refused to attempt to differentiate and harmonize the case law on the grounds that to do so would merely add to the confusion; for the most part, the decisions have been characterized as irreconcilable. (See *New York Central Railroad Co.* v. *Northern Indiana Public Service Co.*, 140 Ind.App. 79 [221 N.E.2d 442].)

The difficulty in determining the issue as to whether the general employer or the special employer, or both, should be liable for the tort of the loaned servant arose out of the test governing its application. In determining the vicarious liability issue, the courts have uniformly applied the *test of control, i.e.,* which employer had actual control or the right of control—the power to direct the borrowed servant in the details of the work at the time the tort occurred? In adopting the control theory and in weighing the elements of control, courts were inexorably driven to the expedience of making and accepting disparate refinements, ethereal in substance and revolting in reason, in order to reach any semblance of reconciliation of the results flowing from the borrowed servant cases. (See Smith, *Scope of the Business: The Borrowed Servant Problem* (1940) 38 Mich.L.Rev. 1222, 1253.)

As in other jurisdictions, California courts applied the control test with varying results. In 1922, it was held that when a master (general employer) hires out under a rental agreement the services of his employee (loaned servant) for the operation of an instrumentality owned by the master, together with the use of the instrumentality, without relinquishing to the hirer (special employer) the power to discharge such servant, the legal presumption is that, although the hirer directs the servant where to go and what to do in the performance of the work, the servant who is the operator of the instrumentality employed in the doing of the work, remains, in the absence of an agreement to the contrary, the servant of the *general employer* insofar as concerns the manner and method of operating the instrumentality, and the general employer is solely liable for the servant's negligence in the operation of such instrumentality. (*Billig* v.

*Southern Pacific Co.,* 189 Cal. 477, 485-486 [209 P. 241].) In accord are other authorities holding that if the special employer does not have power to discharge the servant even though he directs the servant where to go and what to do in performance of the work, the servant, as operator of the instrumentality employed in the doing of the work, remains the employee of the *general employer,* with the latter being *responsible* under the doctrine of *respondeat superior* for the servant's negligence. (*McComas v. Al. G. Barnes Shows Co.,* 215 Cal. 685 [12 P.2d 630]; *Mart v. Riley,* 239 Cal.App.2d 649 [49 Cal.Rptr. 6]; *Doty v. Lacey,* 114 Cal.App.2d 73 [249 P.2d 550]; *Lowell v. Harris,* 24 Cal.App.2d 70 [74 P.2d 551].)

Conversely, the proposition has been propounded that an employee may be the general servant of one person and may be hired to another for a special service, and when he is subject wholly to the direction and control of the *special employer,* the *latter,* not the general employer, is *liable* for the borrowed servant's negligence; but to escape liability for the negligence of a servant whose services have been rented or hired to another, the general employer must resign full control of the servant for the time being. (See *Doty v. Lacey, supra,* 114 Cal.App.2d 73, 78.) In those cases where the special employer may be liable, the paramount consideration is whether the alleged special employer exercises control over the details of the work; such control strongly supports an inference that a special employment exists. (*McFarland v. Voorheis-Trindle Co.,* 52 Cal.2d 698, 705 [343 P.2d 923].) If one employer hires out either the services of his employee to another employer or rents an instrumentality and an employee to operate it, the second or special employer may become temporarily liable for his tortious actions under the "borrowed servant" rule. (See 1 Witkin, Summary of Cal. Law (7th ed. 1960) Agency and Employment, § 69, p. 442.)

With the development of the borrowed servant doctrine, another line of cases appeared suggesting that instead of imposing liability solely on the general employer or only on the special employer, a third alternative should be considered, to wit, both could be held liable. Under these authorities, the control factor was still utilized as the primary test in determining vicarious liablity. A general and special employer may both be held liable for the employee's negligence where each had some power, not necessarily complete, of direction and control; the control need not be exercised; it is deemed sufficient if the right to direct the details of the work existed. (*McFarland v. Voorheis-Trindle Co., supra,* 52 Cal.2d 698, 704.) Where, at the time of the accident, both the general and the special employer exerted some measure of control over the employee, both may be held liable for the employee's negligence. (*Rosander v. Market Street Ry. Co.,* 89 Cal.App. 721, 735 [265 P. 541].)

Consequently, three possible results have flowed from the application of the *control test* in the borrowed servant cases: (1) liability of the general employer; (2) liability of the special employer; and (3) liability of both employers.

Intertwined with the difficulty of applying the control test to the borrowed servant cases, has been the related problem of whether the liability of the general or special employer, or both, for the torts of the loaned servant is a question of law, a question of fact, or a mixed question of law and fact. In determining the agency question in the loaned servant cases, California courts have handled the issue in the following manner, depending on the facts, and inferences to be drawn therefrom, of each case: (1) Agency *existed* between the general employer and the employee as a matter of law (*McComas* v. *Al. G. Barnes Shows Co., supra,* 215 Cal. 685; *Billig* v. *Southern Pacific Co., supra,* 189 Cal. 477; *Balding* v. *D. B. Stutsman, Inc.,* 246 Cal.App.2d 559 [54 Cal.Rptr. 717]; *Mart* v. *Riley, supra,* 239 Cal.App.2d 649); (2) agency did *not* exist between the general employer and the employee as a matter of law (*Deorosan* v. *Haslett Warehouse Co.,* 165 Cal.App.2d 599 [332 P.2d 422]; (3) agency *existed* between the special employer and the employee as a matter of law (*Sehrt* v. *Howard,* 187 Cal.App.2d 739 [10 Cal.Rptr. 128]); (4) agency did *not* exist between the special employer and the employee as a matter of law (*Lowell* v. *Harris, supra,* 24 Cal.App.2d 70); and (5) those holding that whether a general employment or special employment relation existed ordinarily presents a question of fact (*McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d 698; *Moss* v. *Chronicle Pub. Co.,* 201 Cal. 610 [258 P. 88, 55 A.L.R. 1258]; *Stewart* v. *California Imp. Co.,* 131 Cal. 125 [63 P. 177]; *Sparks* v. *L. D. Folsom Co.,* 217 Cal.App.2d 279 [31 Cal.Rptr. 640]; *Welborn* v. *Dalzell Rigging Co.,* 181 Cal.App.2d 268 [5 Cal.Rptr. 195]; *Miller* v. *Long Beach Oil Dev. Co.,* 167 Cal.App.2d 546 [334 P.2d 695]; *Deorosan* v. *Haslett Warehouse Co., supra,* 165 Cal.App.2d 599; *Doty* v. *Lacey, supra,* 114 Cal.App.2d 73; *Madsen* v. *LeClair,* 125 Cal. App. 393 [13 P.2d 939]; *Valdick* v. *LeClair,* 106 Cal.App. 489 [289 P. 673]; *Peters* v. *United Studios, Inc.,* 98 Cal.App. 373 [277 P. 156]).

Capably recognizing the inconsistencies in the decisions resulting from the application of the control test in the loaned servant cases, Young (general employer) claims that the trial court committed serious error in ruling, as a matter of law, that he was responsible for Hurtado's negligence. Young predicates his claim of error on the evidence indicating that he did not exercise any control over Hurtado on the Allbright Street job and, in fact, never visited the job or gave the rig operator any instructions or directions whatsoever, except to follow Hale's orders. Similarly, Hale

(special employer) claims that its firm did not exercise any significant control over Hurtado so as to be vicariously responsible for his tort. In support of its argument, Hale contends that the essential element of control is the right to discharge the employee, as contrasted with the giving of mere information or general signals as to where the instrumentality should be used, and that it did not have the right to fire Hurtado.

Turning first to Hale's contention, the paving firm relies on *Billig* v. *Southern Pacific Co., supra,* 189 Cal. 477, and its progeny, holding that where a special employer does not enjoy the right to discharge the borrowed servant, only the general employer is liable for his negligence. While the *Billig* court held that the special employer was not liable under the doctrine of *respondeat superior,* in doing so, it utilized the following language: ". . . [T]he application of the doctrine of *respondeat superior* in any given case depends upon the power of control which the superior possesses, and which for the protection of third persons he is required to exercise, over the conduct and activities of his subordinates. Consequently the doctrine has application only in cases where the power of control exists, and such power does not exist in a situation where the special employer has no voice in the selection or retention of the negligent subordinate. [Citations omitted.]" (P. 483.)

In answer to Hale's argument to the effect that it did not possess the power to discharge Hurtado and that its checker and dump boy merely gave him signals or directions as to where to remove the dirt and where to deposit it, it should be emphasized that if the ultimate determination of liability in borrowed servant cases is controlled by the doctrine of *respondeat superior* (*Billig* v. *Southern Pacific Co., supra*), then the policy considerations underlying *respondeat superior* must also be examined.

As early as 1947, the California Supreme Court defined the public policy factors underlying an employer's vicarious liability in the following terms: "The principal justification for the application of the doctrine of *respondeat superior* in any case is the fact that the employer may spread the risk through insurance and carry the cost thereof as part of his costs of doing business." (*Johnston* v. *Long,* 30 Cal.2d 54, 64 [181 P.2d 645].) Twenty-three years later, the same court amplified the policy factors underlying the doctrine imposing liability without fault in *Hinman* v. *Westinghouse Elec. Co.,* 2 Cal.3d 956, 959-960 [88 Cal.Rptr. 188, 471 P.2d 988], in the following language: "Although earlier authorities sought to justify the *respondeat superior* doctrine on such theories as 'control' by the master of the servant, the master's 'privilege' in being permitted to employ another, the third party's innocence in comparison to the master's selection of the servant, or the master's 'deep pocket' to pay for the loss, 'the modern

justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise which will, on the basis of past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large.' (Prosser, Law of Torts (3d ed. 1964) p. 471; fns. omitted.)"

In an expert critique, a legal source points out why the *control* justification for liability should be discarded in the dual employer situation just as it has been abandoned in the single employer situation. In the case of a borrowed servant, both the general employer and special employer share control; while the general employer can fire the employee, the special employer can dismiss him from the particular job; while the general employer can direct the borrowed servant in the general use of the instrumentality, the special employer directs him on the particular aspects of the job at hand; control is thus actually *split* and it is a test without meaning. (*Borrowed Servants and the Theory of Enterprise Liability* (1967) 76 Yale L.J. 807; see also Smith, *Scope of the Business: The Borrowed Servant Problem* (1940) 38 Mich.L.Rev. 1222, 1228-1231.)

Liability in borrowed servant cases involves the exact public policy considerations found in sole employer cases. Liability should be on the persons or firms which can best insure against the risk, which can best guard against the risk, which can most accurately predict the cost of the risk and allocate the cost directly to the consumers, thus reflecting in its prices the enterprise's true cost of doing business.

Control, then, at least in the narrow sense suggested by Hale, is not dispositive of this case. The theory having greater integrity in *respondeat superior* cases is allocation of risk.

■ In light of the policy factors underlying *respondeat superior,* it is inconceivable that Hale should escape liability. A special employment relationship with Hurtado was conclusively established. Obviously, the resurfacing work being accomplished was within the regular scope of Hale's business. Hale was to profit from this job. Hale understood the risks inherent in construction work and was in a position to guard against, and insure against, such risks. Consequently, Hale was not at all prejudiced

by the trial court's ruling allowing the question of its liability to go to the jury. To the contrary, the court could have instructed the jury, in view of the foregoing policy factors, that the road builder was vicariously liable for Hurtado's negligence as a matter of law.

Finally, Young (general employer) urges that the trial court committed prejudicial error in ruling as a matter of law that Hurtado was his agent at the time of the accident. He contends the facts of the case are susceptible to more than one inference as to the relationship between himself and Hurtado, and the agency issue therefore required jury resolution.

For an employer to be vicariously liable for the negligent acts of his servant, the servant must have been acting within the scope of his duties. Young seems to contend that when Hurtado was working for Hale, he was not necessarily working for Young. But as Young concedes, an employee can have more than one employer, both of whom may be simultaneously liable for a negligent act of the employee. (See *McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d 698; *Rosander* v. *Market Street Ry. Co., supra,* 89 Cal.App. 721; Rest. 2d Agency, § 226.)

This is just such a case. Young owned the tractor and was profiting from the renting of the rig, as well as Hurtado's employment with Hale. Young reserved the right to dismiss Hurtado. This analysis of Young's liability does not contradict the earlier discussion holding Hale liable despite previous case law that may not have held Hale liable. In those cases (*Billig* v. *Southern Pacfic Co., supra,* 189 Cal. p. 487; *Mart* v. *Riley, supra,* 239 Cal.App.2d 649; *Lowell* v. *Harris, supra,* 24 Cal.App.2d 70) the court held the general employer liable as a matter of law. The language questioned previously in those cases does not bear on that issue, but whether the special employer should also be liable. Their holdings as to the general employer's initial liability are sound.

Young urges he should not be liable to the plaintiffs inasmuch as he is not in the business of renting heavy equipment and furnishing an operator. But the policy factors heretofore discussed weigh as heavily on Young as on Hale. While Young is a farmer and not directly engaged in letting construction equipment and providing an operator, his agriculture venture can be equated with any other enterprise engaged in business for profit. Farming in California can be big business. Tractors are driven on highways frequently and infrequently in agriculture production. One cannot expect to put a $24,000 rig and driver to work on a public highway—a place fraught with danger—without incurring liability for the operator's negligence. If Young did not feel he had sufficient control of the working conditions or sufficient knowledge of the construction business to guard

against the risks, he could have contracted for specific indemnity or obtained the appropriate liability insurance. (See *Widman* v. *Rossmoor Sanitation, Inc.,* 19 Cal.App.3d 734 [97 Cal.Rptr. 52].)

In conclusion, it should be parenthetically noted that Hale (special employer) and Young (general employer) have filed cross-complaints against the other based on implied indemnity.[3] In any future trial, the joint tortfeasors will then be accorded the opportunity to show, on equitable principles, why the other should be held primarily liable for Hurtado's negligence. In this connection, Young argues that Hale should have had a flagman on duty to warn drivers on Route 115 of the construction work being done on Allbright Street and of the heavy equipment crossing the main highway, or a flagman to direct the rig operators crossing the highway, and that the failure to provide a flagman was the actual and proximate cause of this accident. Assuming, without deciding, that Hale had such a duty or assuming that even if Hale had no such duty, Young will have an opportunity to establish in his action for indemnity that Hale was primarily responsible for the injuries and damages incurred by the plaintiffs herein, particularly in view of the evidence indicating Young played a passive role in the events culminating in plaintiffs' damages. (See *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco,* 267 Cal.App.2d 881 [73 Cal.Rptr. 660].) However, the merits of the indemnity actions are not before us and patently cannot be resolved in this appeal.

The judgment is affirmed.

Gardner, P. J., and Gabbert, J., concurred.

---

[3]The trials on the complaints and cross-complaints were bifurcated for obvious reasons.