[Civ. No. 10443. First Appellate District, Division Two.—December 16, 1937.]

LILY W. LOWELL et al., Plaintiffs and Appellants, v. J. HENRY HARRIS et al., Defendants and Appellants; W. H. TALBOTT, Respondent.

Jesse E. Nichols and Elwood Murphey for Plaintiffs and Appellants.

Owen M. Gentry and Hamilton Wright for Defendants and Appellants.

Weinmann, Quayle & Berry for Respondent.

JOHNSON, J., *pro tem.*—This is an action in which the plaintiffs, who are respectively the widow and the married daughter of George P. Lowell, deceased, brought suit for damages by reason of the death of said decedent, which, the plaintiffs alleged, was caused by negligence of the defendants in the operation of an automobile truck driven by the defendant Wilson.

The defendant Harris was the owner of the truck, and had rented it with his employee, Wilson, as driver, to the defendant Talbott for use in certain business of the latter. At the trial a nonsuit was granted in favor of the defendant Talbott; and pursuant to a verdict of $15,000 against the other defendants, judgment against them in that sum was entered in favor of plaintiffs. Upon motion of those defendants for a new trial, the amount of the judgment was, with the acquiescence of the plaintiffs, reduced to $10,000. From the judgment so modified the defendants Harris and Wilson appealed; and from the judgment in favor of the defendant Talbott entered upon his motion for nonsuit, the plaintiffs have appealed. The appellants other than Wilson respectively invoke the principles affecting liability of general and special employers.

The defendant Harris, who was an excavating contractor, owned several trucks which were operated, as occasion required, by men in his employ, of whom Wilson was one. The defendant Talbott had a contract to haul and spread road materials for use by a subcontractor in furtherance of construction of the so-called "Broadway Low Level Tunnel", designed to facilitate travel between Alameda and Contra Costa Counties, and having its westerly portal on or near upper Broadway in Oakland.

In the latter part of September, 1935, Talbott and Harris had a telephone conversation whereby, upon a proposal made by Talbott, it was agreed that Harris would rent to Talbott some of the former's trucks, when not needed by Harris himself, and which might be wanted from time to time by Talbott in performance of his hauling contract. With trucks

so to be hired by Talbott, it was agreed that Harris should furnish drivers at his expense; and in accordance with the usual practice Harris supplied the requisite gasoline and oil, and maintained the trucks in operative condition. In the beginning the hauling was being done from Hutchinson's quarry at El Cerrito, and the price was fixed at the rate of 40 cents a ton. There were working days, however, when no hauling at all was done by Harris's trucks; and on October 22d, a change to Blake Brothers' quarry in Richmond being made, the rate per ton was increased because of a longer haul. At the conclusion of service for either a full or a fractional day, the trucks were returned by the drivers to Harris's yard, where they remained at night; and each morning the drivers reported there to ascertain whether there was work for them to do, either on a job of Harris himself or that of Talbott or of someone else.

One of the trucks used, as needed, in Talbott's work was a Chevrolet dump-truck of which the defendant Wilson was the driver. Wilson had worked intermittently for Harris in fairly regular employment during a period of seven to nine years.

On the morning of October 22, 1935, when the change was made to Blake Brothers' quarry, Wilson had made one trip with his truck from that quarry to the tunnel, and was on his way back to the quarry in Richmond for another load. It was on that return trip to the quarry that the accident in question occurred, shortly after 10 o'clock in the morning, at the intersection of San Pablo Avenue and Bancroft Way in the city of Berkeley.

Wilson was driving in a northerly direction along San Pablo Avenue; and at its intersection with Bancroft Way, Mr. Lowell was walking across the avenue from east to west in the northerly crosswalk plainly marked for pedestrians. The day was clear and the street dry. The easterly half of the avenue had a ''passing lane'' marked off, adjacent to the center line, for northerly vehicular travel; and Wilson was operating his truck in that inner lane at a speed, as he said, of 20 to 25 miles an hour. According to his testimony, there was a car to his right somewhat ahead of him as he neared Bancroft Way. During his approach toward the intersection, he was looking straight along his lane; and not until Wilson himself was within ten to twelve feet of the

southerly edge of the crosswalk, did he see Mr. Lowell, who was then a little to the east of Wilson's lane. Thereupon, realizing the danger, Wilson veered to the left, but not quickly enough to avoid the accident. Mr. Lowell was first brought into contact with the right front fender; and, according to Wilson, was then thrown against the body of the truck, hitting his head against the knob of the door. The impact caused a basal fracture of the skull, and Mr. Lowell died on the following day.

Under subdivision (a) of section 560 of the Vehicle Code of 1935, it was made the duty of the driver of a vehicle to yield the right of way to a pedestrian crossing the roadway within a marked crosswalk; and there was introduced in evidence an ordinance of the city of Berkeley, giving a right of way to a pedestrian crossing within a marked crosswalk, subject to the proviso that such right of way was to be yielded by the operator of a vehicle to those pedestrians, who had entered the half of the roadway being traversed by such vehicle prior to the time that it entered the crosswalk. According to the testimony of Officer Schmidt, who witnessed the accident, Mr. Lowell was close to the easterly line of Wilson's lane of travel before Wilson had entered the intersection. There is evidence that as Mr. Lowell neared that easterly line, he had his face turned somewhat northward, as if to take note of traffic moving southward along the westerly half of the avenue. There is also other evidence that before stepping from the curb into the crosswalk, Mr. Lowell had looked to the south. It is urged on behalf of the defendants, Harris and Wilson, that Mr. Lowell was guilty of contributory negligence as a matter of law in failing to keep looking to the south as he drew near the passing lane. We will recur to that point later, but it should be borne in mind that under the evidence there was a duty on Wilson's part to yield the right of way to Mr. Lowell. In the arguments made on behalf of the defendants Harris and Wilson, there is a tacit concession of negligence on the part of Wilson in his operation of the truck. The only grounds of appeal relied upon in his behalf are contributory negligence of the deceased, excessiveness of the modified judgment, and refusal of the court to grant a new trial.

In behalf of the defendant Harris, it is insisted primarily that Wilson was in the special employ of Talbott and under

his full control; and that in consequence Harris was relieved of all liability for negligence of Wilson in the operation of the truck for Talbott's uses.

In like manner, in the appeal of the plaintiffs from the judgment in favor of Talbott, it is contended that there was sufficient evidence of a measure of control on the part of Talbott, as a special employer of Wilson, to require denial of Talbott's motion for a nonsuit and a submission of the issue to the jury.

The status of Wilson in his dual relationship is really the nodal point in the case.

There is nothing equivocal in the rules affecting general and special employers, as enunciated in a catena of cases in this jurisdiction. ■■ An employee may be in the general service of one person, and may be lent or hired to another for some special service; and if in that service he is subject wholly to the direction or control of that other person, the latter, and not the general employer, is the master *pro hac vice,* and is liable for injuries caused by negligent or wrongful acts of the employee, while engaged in the performance of duties pertaining to such special service. (16 Cal. Jur. 1108, 1109.) ■■ But as stated in *Billig* v. *Southern Pac. Co.,* 189 Cal. 477, 485 [209 Pac. 241], "when a master hires out, under a rental agreement, the services of an employee for the operation of an instrumentality owned by the master, together with the use of the instrumentality, without relinquishing to the hirer the power to discharge such servant, to go where and perform such work as the hirer directs, the legal presumption is that, although the hirer directs the servant where to go and what to do in the performance of the work, the servant, as the operator of the instrumentality employed in the doing of the work, remains, in the absence of an agreement to the contrary, the servant of the general employer in so far as concerns the manner and method of operating the instrumentality, and the negligence of the servant must be held to be that of the owner and not that of the hirer of the instrumentality".

Hence, to escape liability for negligence of a servant whose services have been lent or hired to another, the general employer must resign full control of the servant for the time being. A few of the cases which may be cited in addition in support of the rules stated are *Stewart* v. *California Imp.*

*Co.*, 131 Cal. 125, 129–131 [63 Pac. 177, 724, 52 L. R. A. 205] ; *Moss* v. *Chronicle Pub. Co.*, 201 Cal. 610, 616 [258 Pac. 88, 55 A. L. R. 1258] ; *Umsted* v. *Scofield Eng. Const. Co.*, 203 Cal. 224, 227 [263 Pac. 799] ; *Peters* v. *United Studios, Inc.*, 98 Cal. App. 373, 379 [277 Pac. 156] ; *Valdick* v. *LeClair*, 106 Cal. App. 489, 496 [289 Pac. 673] ; *Scrimsher* v. *Reliance Rock Co.*, 116 Cal. App. 500, 504, 505 [2 Pac. (2d) 862] ; *Carlson* v. *Sunmaid Raisin Growers Assn.*, 121 Cal. App. 719, 726, 727 [9 Pac. (2d) 546].

 The existence of the right of control over the employee is the critical test of liability for his acts. It is the *right* to exercise control rather than the *mere fact* of its exercise which is decisive. (*Peters* v. *United Studios, Inc., supra*.) In the Billig case (*supra*) it is said that the power of control does not exist in a special employer in a situation where he has no voice in the selection or retention of the negligent employee. And in reference to the general employer, the court in the Moss case (*supra*) quoted from 39 C. J., page 1275, the following passage : " 'To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is particularly under the control of a third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary co-operation where the work furnished is part of a larger operation.' "

 In the present case there was no express agreement that Harris should relinquish to Talbott complete control over either Wilson or the truck; nor has attention been directed to any circumstances indicating that as the work progressed, there was any release of authoritative control by Harris. Wilson was paid by Harris; the truck was returned after each day of use to Harris's yard; and Harris might at any time have exercised his discretion in substituting some other driver in place of Wilson. In the absence of any express agreement, the law puts the liability for the acts of a servant upon the person responsible for the servant's selection and retention. The operation of a motor truck through city streets is a matter of so much concern to the owner that, when he has manned the truck with a servant of his own choice as a safeguard of his own interests, clear proof must

be required before he will be presumed to have surrendered full management and control to the hirer.

There has been no change in the fundamental legal principle since the "horse-and-buggy days" when a team was rented with its driver. In reference to liability under such circumstances, it is said in 39 C. J., page 1277: " . . . one who furnishes a driver and team to another for the latter's use for a trip or for a specified time or for a particular purpose is nevertheless liable for injuries resulting from the acts of the servant while performing such services for the third person, provided exclusive control of the driver is not vested in the hirer. The test of liability turns on the question whether the employer or the hirer controls the movement of the driver. Liability of the general employer for the acts of the driver furnished with the team is not affected by the fact that directions are given the driver as to when and where to go, that directions are given as to what shall be carried, or that directions are given to the driver to hurry or to take his time, or that the driver also assisted in the work that the hirer was doing for which the team was used."

In like manner in 1 Restatement of the Law of Agency, page 502, the rule announced is accompanied by this comment: "A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be intent to retain control over the instrumentality." A review of the voluminous transcript before us convinces us that it may not be said that Talbott became vested exclusively with authoritative control over Wilson as the driver of the truck.

We turn now to the appeal of plaintiffs from the judgment of nonsuit in favor of the defendant Talbott. In plain-

tiffs' brief, testimony is quoted showing that Talbott gave the drivers of the hired trucks directions about loading and unloading, about taking precautions so that rock would not be spilled in the streets; gave at times directions concerning the route to be taken, and admonished drivers to stay within the speed limit. Because of something in connection with spreading the rock on delivery at the tunnel, Talbott on one occasion made a suggestion "to have prongs that were sticking back of the truck cut off", saying that "if they did not have it fixed", he could not use the truck on the job. In all matters of that sort such directions or suggestions relate merely to details incident to the use for which the hiring is had. The business of Harris was not that of doing Talbott's work, and Harris had no control over the details of its performance. In his relations with Talbott, Harris's business was that of furnishing trucks with drivers of his own selection; and though he supplied trucks and drivers for use in Talbott's special business, yet in the absence of relinquishment by Harris of complete control over his drivers, they remained in operating the trucks servants of his business, for whose negligence Harris, and not Talbott, would be chargeable.

One of the important elements in such cases is the right of discharge; and assuredly Harris had not conferred upon Talbott the right to discharge any of the drivers furnished. Talbott, if dissatisfied with a particular driver, might have asked Harris to provide another, or might have sent the driver and his truck back to Harris. But there was no power in Talbott to dismiss Wilson, and put the truck under operative control of a man of his own. Upon this point in *Densby* v. *Bartlett*, 318 Ill. 616 [149 N. E. 591, 42 A. L. R. 1406], the court said: "The driver, while performing a special service for appellant, was performing work of his employer, Saracino, within the scope of his employment, viz., driving cars for persons who hired them from his employer." Many of the cases above cited expressly hold that the right of the hirer to direct the driver when and where to go, whom to haul, and the route to travel, does not place the driver under the control of the hirer as to the manner of driving the car. In that regard he is doing the work of the general employer and is not subject to the control of the hirer. In this case appellant was not authorized to discharge a reckless driver

and replace him with another driver. At most he could dismiss the car and driver. In the absence of agreement to do so, it cannot be inferred that the owner of cars of considerable value and requiring competent and skilled persons to drive them, and who employed as drivers men he was willing to trust, would authorize one to whom he hired them to discharge the drivers for any reason.''

And in *Driscoll* v. *Towle*, 181 Mass. 416 [63 N. E. 922], in reference to the renting of a team with the driver, Judge Holmes, as Chief Justice of the court, spoke as follows:

''But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant. More than that is necessary to take him out of the relation established by the only contract which he has made and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books. . . . ''

''In cases like the present, there is a general consensus of authority that, although a driver may be ordered by those who have dealt with his master to go to this place or that, to take this or that burden, to hurry or to take his time, nevertheless in respect to the manner of his driving and the control of his horse he remains subject to no orders but those of the man who pays him. Therefore he can make no one else liable if he negligently runs a person down in the street.''

We take the following excerpts also from the decision of Judge Cardozo in *Charles* v. *Barrett*, 233 N. Y. 127 [135 N. E. 199] : ''We think that truck and driver were in the service of the general employer. . . . Where to go and when might be determined for the driver by the commands of the defendant. The duty of going carefully, for the safety of the van as well as for that of wayfarers, remained a duty to the master at whose hands he had received possession. Neither the contract nor its performance shows a change of control so radical as to disturb that duty or its incidence. . . . The rule now is that, as long as the employee is furthering the business of his general employer by the service rendered to another, there will be no inference of a new relation unless command has been surrendered, and no inference of its surrender from the mere fact of its division.''

In respect of the right of the hirer to designate the route of travel as an incident of his right of use, reference may be

had also to *Thatcher* v. *Pierce*, 281 Pa. 16, 20 [125 Atl. 302], and *Meyers* v. *Tri-State Automobile Co.*, 121 Minn. 68 [140 N. W. 184, 44 L. R. A. (N. S.) 113].

In so far as use of San Pablo Avenue was concerned, Wilson himself said that it was the straightest, widest street, and the nearest route that could be taken to the job; also that it was an arterial way, protected from cross-traffic and open to trucking.

█ Upon the evidence before the court at the time when Talbott's motion for a nonsuit was granted, it is quite clear, in our opinion, that there was nothing which showed that Talbott had authoritative control of the conduct of the driver Wilson in his management and operation of the truck while in transit. The case was therefore brought plainly within the principles laid down in *Billig* v. *Southern Pac. Co.*, 189 Cal. 477 [209 Pac. 241], as well as in the quotations from the texts and the cases from other states gathered in our own research.

We are, therefore, of the opinion that Talbott's motion for a nonsuit was properly granted. █ It is contended, however, by the defendant Harris (but not with concurrence of plaintiffs on their appeal) that the trial court erred in sustaining objections to certain questions put to Harris, and in striking out certain of his testimony, when he was under examination as a witness called by plaintiffs during the presentation of their case. After Harris had testified to the agreement in terms made by telephone conversation between Talbott and himself, and to some other matters, and after he had been cross-examined by Talbott's attorney, he was taken in hand by his own counsel. A large part of the questioning then addressed to him was to discover whether there might be circumstances which would serve to shift liability from Harris to Talbott. The questions so propounded were framed with a view to drawing forth testimony as to whether there existed any local custom or usage under which a driver, furnished by his employer in renting a truck to another, was to follow the instructions of the hirer in regard to management, operation and control of the truck, while engaged in doing the things pertaining to the special work undertaken by the hirer. We have read not only the portions of the record printed in the brief of the defendant Harris, but have carefully considered all that appears in the tran-

script on the subject. Many of the questions ruled out were objectionable in form. It appears, however, that Harris testified that there was a local custom in respect of operation, management and control of trucks rented with drivers; and then when asked what "the rule" was, he said, "The man to whom the truck is furnished controls the direction". Complaint is made because that answer and others like it were stricken out. Harris said also that the drivers "took orders from the men who hired the trucks". This represents what we conceive to be the substance of Harris's statements on the point. He admitted, however, that nothing was said between him and Talbott as to who should have supervision over Wilson from the time the latter arrived on the job, or as to who should direct Wilson after he left his general employer's yard.

The answers of Harris which were stricken out did no more than import what the law implies as to the right of the hirer to give directions as to details incident to the accomplishment of his particular work. Nothing that Harris said indicates, to our minds, that there was any general usage or custom in the renting of trucks with drivers for such hauling purposes, whereby physical control of the owner's drivers were surrendered to the hirer as a sovereign master, or any right of complete control of the mechanical operation, management and care of the trucks in traveling to and fro between the points of loading and delivery.

Such undoubtedly was the view of the trial court in making the rulings criticised. For in sustaining objection to one of the questions, the judge said that the contract was not uncertain or ambiguous; and upon the question of management and control of the truck he referred to the cases of *Billig* v. *Southern Pac. Co.* and *Stewart* v. *California Imp. Co.*, hereinbefore cited. As is said in *May* v. *American Trust Co.*, 135 Cal. App. 385, 391 [27 Pac. (2d) 101], it is generally the province of the trial court to construe the contract in question, and first determine whether any uncertainty or ambiguity exists; and evidence of usage is not admissible to vary the terms of a clear and unambiguous contract.

In Shearman & Redfield on Negligence, sixth edition, section 162, page 392, regarding the right of control, the rule is stated in these words: "The hirer can not properly be said to have control of the servants, unless he has the right

to discharge them and employ others in their places in case of their misconduct or incapacity; that being the only practicable means by which free servants can be controlled. If, therefore, the hirer has no such power, he is not responsible to any one for the faults of the servants. If the hirer is vested for the time with *exclusive* control with the right to discharge the servants and to employ others, he alone is responsible for their defaults. Where a person hires the personal property of another, who supplies, under the contract, a servant charged with the general management and control of the property, although the hirer acquires, to a limited degree, a dominion over the servant, with a right to superintend and direct his conduct, the owner continues responsible for the servant's negligence, though it occurs in the performance of work in which the hirer alone is interested.''

We conclude that no prejudice was suffered by the appellants in the rulings made.

██ Error is charged also in an instruction given on the court's own motion in this form: ''You are hereby instructed the defendant Will D. Wilson, driver of the automobile truck on the occasion in controversy here, was the employee, agent and servant of the defendant J. Henry Harris, and negligence, if any, on the part of defendant Will D. Wilson is imputed to said defendant J. Henry Harris.''

This instruction left to the jury the question whether Wilson was negligent in the operation of the truck, and added that if the fact should be so found, such negligence would be imputable to his employer, Harris. Other instructions dealt with the element of proximate cause, and with the subject of contributory negligence charged against Mr. Lowell. In view of what has been said, we find no error in the instruction so given; nor in the refusal to give a formula instruction proposed on behalf of Harris, relative to the responsibilities of general and special employers; the refusal being placed by the judge upon the ground that said instruction was not applicable to the case.

It remains to consider briefly the contentions that the deceased was chargeable with contributory negligence as a matter of law, and that the amount of the judgment, even as modified, is excessive.

██ Under the law Mr. Lowell in his use of the crosswalk had the right of way; and while proceeding with ordinary

care, he was justified in assuming, in the absence of reasonable warning of danger, that his right of way would be respected. There is evidence that before he stepped from the curb into the crosswalk, Mr. Lowell looked to the south. He then proceeded along the crosswalk almost to the easterly edge of the passing lane, which was approximately ten feet from the center line of the avenue, the width of which was 74 feet. Just what observation he made, while so proceeding, concerning traffic approaching from the south is not known. He was not required in the exercise of his right of way to keep looking continuously to the south; and as he drew close to the passing lane, he looked, not unnaturally, northward to apprise himself of traffic from that direction before crossing into the westerly half of the roadway. ██ There being no definite evidence as to the precautions otherwise taken by him in his course, the presumption is that during his progress he used reasonable care and vigilance for his own safety. (*DeLannoy* v. *Grammatikos*, 126 Cal. App. 79, 85 [14 Pac. (2d) 542]; *Lam Ong* v. *Pacific Motor T. Corp.*, 16 Cal. App. (2d) 274, 277 [60 Pac. (2d) 480].) To ignore that presumption "would be in effect to presume negligence on the part of one in excuse of negligence on the part of another". (*Gay* v. *Winter*, 34 Cal. 153, 164; *Hollowell* v. *Cameron*, 186 Cal. 530, 533 [199 Pac. 803]; *Jones* v. *Hedges*, 123 Cal. App. 742, 753 [12 Pac. (2d) 111].)

If, though he saw Wilson approaching from a distance, Mr. Lowell, as a result of his observation, deemed himself secure in the protection of his right of way, or miscalculated the distance or the speed of the truck, he would not necessarily be chargeable with contributory negligence as a matter of law. In dealing with the subject, the court, in *White* v. *Davis*, 103 Cal. App. 531, 542 [284 Pac. 1086], spoke thus: "There seems to be a general rule running through the cases where a pedestrian, or one standing on a highway, is injured by an automobile, which usually determines whether the question of contributory negligence is one of law, or of fact. Where the injured party fails to look at all, or looks straight ahead without glancing to either side, or is in a position where he can not see, or in other words, where he takes no precaution at all for his own safety, it is usually a question for the court. Where he looks but does not see an approaching

automobile, or seeing one, erroneously misjudges its speed or distance, or for some other reason assumes he could avoid injury to himself, the question is usually one for the jury.'' In the present instance we have no doubt that the determination of the issue was properly left to the jury.

██ Nor do we think that the modified judgment should now be further reduced. At the time of his death Mr. Lowell was 68 years of age, possessed of good health and vigor, and had an expectation of life of 9.7 years. He and his family had a happy and congenial home life, and his wife especially has been deprived of the society, comfort and protection of her husband. While the decedent's earnings had been lessened during the depression years, there was evidence that he had earned for some time prior to his death about $100 a month. After careful consideration of the matter on the motion for a new trial, the trial judge cut down by one-third the amount of the jury's award; and this court may safely rely on his fairness of mind supported by years of judicial experience.

The judgment against Harris and Wilson having been modified, there was no abuse of discretion in denial of their motion for a new trial.

The judgments subjected to appeal are hereby affirmed.

Spence, Acting P. J., and Sturtevant, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 11, 1938.