[S. F. No. 15772. In Bank.—April 17, 1939.]

PAUL ENTREMONT et al. Petitioners, v. LEON O. WHIT-SELL et al., Respondents.

Albert E. Sheets, C. C. Carleton, C. R. Montgomery, Robert E. Reed, Frank B. Durkee and P. N. McCloskey for Petitioners.

Ray L. Chesebro, City Attorney (City of Los Angeles), Frederick von Schrader, Assistant City Attorney, Bourke

Jones, Deputy City Attorney, and Carl R. Schulz, as *Amici Curiae*, on Behalf of Petitioners.

Ira H. Rowell, Roderick B. Cassidy, Frank B. Austin, Scott Elder and Mary J. Moran for Respondents.

Edward M. Berol, Wallace K. Downey, H. J. Bischoff, Sanborn, Roehl & MacLeod, Douglas Brookman, Hugh Gordon, Reginald L. Vaughan, Varnum Paul, Robert Brennan, Gerald E. Duffy, Frank Karr, E. E. Bennett, C. W. Dooling, L. N. Bradshaw, McCutchen, Olney, Mannon & Greene, Guy V. Shoup, C. O. Amonette and R. E. Wedekind, as *Amici Curiae*, on Behalf of Respondents.

THE COURT.—This is an original proceeding in *certiorari* instituted by petitioners Entremont and the State Department of Public Works against the Railroad Commission to secure an annulment of an order of the respondent commission. In the order sought to be annulled it was found that Entremont, as a private carrier, and subject to regulation by the commission, had charged the Department of Public Works less than the minimum rates fixed for such service by the commission, and Entremont was ordered to collect from the department the amount of such undercharge and to abstain from charging less than the rate fixed for such service by the commission.

There is practically no dispute as to the facts. So far as pertinent here they are as follows:

In 1935 the legislature passed the Highway Carriers' Act (Stats. 1935, chap. 223, p. 878; Deering's 1935 Supp., Act 5129a, p. 1358), conferring upon the commission, with certain exceptions, the power to fix the rates to be charged by highway carriers, as distinguished from common carriers. Acting pursuant to the power thus conferred, the commission fixed the minimum rate for the transportation of sand, rock, gravel, excavated material, and road building material in automobile dump trucks of three and one-half cubic yards capacity, at $2.59 per hour. After this order was made, Entremont, who then held a permit as a radial highway common carrier, on February 11, 1936, as the lowest responsible bidder, entered into a contract with the Department of Public Works, Division of Highways, whereby he agreed to "rent" three

dump trucks of the above-described capacity, with drivers, to the department, the trucks to be used as needed for the transportation of road building or excavated material in the repair of highways. This contract fixed a "rental" price of $2.50 per hour for the use of such trucks and drivers. After entering into this contract the three trucks were used by the department pursuant to the agreement for 251 hours. According to the rate fixed by the contract, less a discount of ½ per cent for cash, the return to Entremont was $25.72 less than he would have received had he charged the minimum rate of $2.59 per hour fixed by the commission for such service.

Upon its own motion, the commission instituted an investigation into the charges Entremont was making for the use of his dump trucks under the contract. In this proceeding the department intervened on behalf of Entremont. Several truck associations likewise intervened. As a result of this investigation, and after a full hearing, the commissiion determined that the contract between Entremont and the Department of Public Works called for the transportation of materials on the highway within the meaning of the order of the commission fixing the minimum rates for such service. It thereupon made and entered its order here sought to be annulled.

The petitioners make two main contentions:

First, assuming the constitutionality of the Highway Carriers' Act, *supra,* it is contended that the transactions here involved were not within the purview of that act; and second, that if the transactions were within the act, the statute is unconstitutional.

In connection with the first contention, the main arguments of petitioners are that the transaction is controlled not by the Highway Carriers' Act, but by sections 136 and 136.5 of the Streets and Highways Code (Stats. 1935, chap. 29, p. 248); that the trucks were contributing to the maintenance of the highways, and, therefore, were not being operated over the public highways within the meaning of the Highway Carriers' Act; and that the act, in any event, does not apply to hauling performed by the state. In our opinion, none of these arguments is sound.

The first argument is predicated upon the premise that the contract between Entremont and the department did not constitute the transportation of property for compensation

over the public highways, but was in fact the leasing or renting of trucks within the meaning of sections 136 and 136.5 of the Streets and Highways Code. These sections require competitive bidding for the "leasing or renting of tools or equipment for state highway purposes" by the department. It must be conceded that if Entremont had rented or leased his trucks to the department, and, if then the department had operated these trucks, clearly the transaction would not be subject to the rate regulations of the commission. In that event the transaction would be governed by the sections of the Streets and Highways Code. On the other hand, if Entremont, under the contract, operated the trucks, and transported the property of the state over the public highways for compensation or hire as a business, then the Highway Carriers' Act is applicable and the Streets and Highways Code provisions have no application.

It is our opinion that the contract, denominated by the parties as a "Service Agreement", was for the transportation of property by motor vehicle, and was not for the renting or leasing of tools or equipment. The contract provides that Entremont, "hereinafter called the vendor, hereby agrees to furnish the services or rental . . . to the Department of Public Works . . . and agrees to receive and accept as full compensation therefor the prices named in the following memorandum:

"For the rental of three only three and one-half yard dump trucks for 500 hours each at $2.50 each per hour, including operation.

"The trucks are to be used principally under power shovels for hauling gravel, slide material, etc., and for other miscellaneous hauling jobs as required anywhere in District 1."

After designating the specifications of the trucks, the agreement contains certain "special provisions". It is therein provided, among other things, that "the equipment is to be operated by the vendor, and the vendor is to furinsh competent operators, all operating supplies such as gasoline, oils, etc., and all repairs necessary to keep the equipment in efficient running order"; that "the equipment will only be used as required . . . "; that the trucks must be kept within District 1 ready for immediate call; that "the operators furnished under this Service Agreement are to perform their duties to the satisfaction of the Department of Public Works, and the

vendor is to replace them at any time that they do not prove satisfactory, at his own expense''. The agreement required Entremont to carry compensation insurance and to assume all liability for damage to other property or injury to persons caused by the operation of the equipment. It also was provided that ''all persons engaged on this work are employees of the vendor and none are employees of the Department of Public Works''.

Although the solution of the problem is not entirely free from doubt, it is our opinion that this contract did not constitute the renting or leasing of equipment to the department but was a contract calling for the transportation of property by motor vehicle by Entremont. This conclusion follows from the fact that under the contract the possession and control of the trucks and the operators thereof did not pass to the department—the operators did not become the employees of the department—but such possession and control remained in Entremont. The chief characteristic of a renting or a leasing is the giving up of possession to the hirer, so that the hirer and not the owner uses and controls the rented property. (Civ. Code, secs. 1925, 1955.) The record is clear that the only supervision exercised by the department over the operators of the trucks was to direct them where to load and unload the material hauled, when to go on or leave the job, and to inform the operators whether the load should be dumped or spread. The department had no power to discharge the drivers—that power, and the power of selection, rested in Entremont. That is a factor of some importance in ascertaining whether Entremont or the department controlled the operators. (*Lowell* v. *Harris,* 24 Cal. App. (2d) 70 [74 Pac. (2d) 551].) Moreover, the provisions of the contract indicate that it was not the intention of the parties that the department should exercise exclusive control over the operators. The contract required Entremont to keep the trucks in repair; to pay all expenses incidental thereto; to supply all oil, gas and other materials necessary for their operation; to carry compensation insurance on the drivers, and expressly provided the operators were the employees of Entremont. Further, under the contract, Entremont assumed all responsibility for damage or injury to other persons or property by reason of the operation of the trucks. This provision strongly

implies that exclusive control was not conferred on the department.

The general rules applicable to this situation have been correctly stated in many cases. The applicable rule is stated in 39 Corpus Juris, section 1462, page 1274, as follows: "A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out the work to the servant, or gives him signals calling the service into activity, or gives him directions as to the details of the work and the manner of doing it." This rule has been adopted by many cases in this state. (*Billig* v. *Southern Pac. Co.*, 189 Cal. 477 [209 Pac. 241]; *Stewart* v. *California Imp. Co.*, 131 Cal. 125 [63 Pac. 177, 52 L. R. A. 205]; *Lowell* v. *Harris, supra*; see, also, *Wagner* v. *Larsen*, 174 Wis. 26 [182 N. W. 336]; *Shepard* v. *Jacobs*, 204 Mass. 110 [90 N. E. 392, 134 Am. St. Rep. 648, 26 L. R. A. (N. S.) 442]; *Morris* v. *Trudo*, 83 Vt. 44 [74 Atl. 387, 25 L. R. A. (N. S.) 33]; *Cook* v. *Wright*, 177 Miss. 644 [171 So. 686].)

We think the rule of these cases rather than the doctrine stated in *Department of Water & Power* v. *Industrial Acc. Com.*, 220 Cal. 638 [32 Pac. (2d) 354], and *Independence Indemnity Co.* v. *Industrial Acc. Com.*, 203 Cal. 51 [262 Pac. 757], cases relied upon by petitioners, is applicable here. These last two cases recognized that where the special employer exercises some measure of control comparable to the control here involved, an injured employee under the Workmen's Compensation Act can secure an award against both his special and general employer. We think that in ascertaining whether the contract called for a rental of equipment or for services to be performed by Entremont, the cases above cited dealing with the doctrine of *respondeat superior* rather than the cases dealing with compensation under the Workmen's Compensation Act state the proper rule. This is so because the problem is who operated the trucks, and who was responsible for their operation, and not as to the liability to special employees under the Workmen's Compensation Act.

The case of *People* v. *Tedesco*, 18 Cal. App. (2d) 667 [64 Pac. (2d) 966], cited by petitioners, is not helpful on this issue. That decision was on demurrer, and the actual facts of the operation do not appear.

There are two other factors which are of some importance, although neither is conclusive, on this phase of the

problem. If it should be held that under the contract the equipment, with operators, was rented to the department, and that the department was, therefore, in exclusive control of the operators, then the operators would be employees of the state, and, it would probably follow, that the contract would be illegal and void under the provisions of article XXIV of the state Constitution, and of the Civil Service Act (Deering's Gen. Laws, (1937) Act 1401, p. 740), as these provisions have been interpreted in *State Compensation Ins. Fund* v. *Riley,* 9 Cal. (2d) 126 [69 Pac. (2d) 985], and *Stockburger* v. *Riley,* 21 Cal. App. (2d) 165 [68 Pac. (2d) 741]. Where two interpretations are possible, one rendering the contract valid and the other rendering it illegal, the former, under elementary principles, is to be preferred.

Secondly, it should be mentioned that petitioner Entremont apparently conceived the transaction to be one whereby he was engaged in the transportation of property by motor vehicles upon the highways, instead of a renting contract, because in his return filed with the state board of equalization pursuant to the Motor Vehicle License Tax Act (Stats. 1933, chap. 339, p. 928), he included the income paid to him by the department as part of his gross receipts. That act, so far as pertinent here, would not be applicable if the transaction involved a rental.

From all these circumstances it must be held that the transaction lacks that element of a transfer of use and possession of property to the hirer which is essential to the existence of a leasing (*Holmes* v. *Railroad Com.,* 197 Cal. 627 [242 Pac. 486]; *Reavley* v. *State,* 124 Tex. Cr. Rep. 528 [63 S. W. (2d) 709]); that the provisions of the Streets and Highways Code have no application; and that the operation called for by the contract was the transportation of property for compensation over the public highway as a business within the meaning of the Highway Carriers' Act.

Petitioners' next contention is that the transportation involved herein was for the purpose of maintaining a public highway, and did not constitute transportation upon a public highway within the meaning of the act. The contract itself described the operation as "hauling gravel, slide material, etc., and for other miscellaneous hauling jobs as required anywhere in District 1". The evidence shows that the department needed these trucks, in addition to trucks owned and

operated by it, as emergency equipment to assist it in keeping the public highways in District 1 in proper repair. Although District 1 includes Del Norte, Humboldt, Mendocino and Lake Counties, and part of Trinity and Siskiyou Counties, the evidence shows that the actual operations of Entremont under the contract were limited to an eleven-mile strip of the state highway between the Sonoma-Mendocino County line and the town of Hopland. The trucks were used either to transport gravel from the gravel pits to the point where the gravel was used for the purpose of filling washed out portions of the road, or to transport excavated material from where excavated to the point of disposal. A major portion of each movement of the trucks was the transportation of these materials over the public highway, which highway was then open to public travel. The hauls varied in length from eleven miles to a few hundred feet. As far as Entremont is concerned, he being the person, as already held, who was performing the operation, clearly the above-described activities constitute the transportation of property for commercial purposes for a compensation over the public highways within the meaning of the Highway Carriers' Act. So far as Entremont is concerned, he was transporting the material to be used in repair of a highway over the highway. He was engaged in a commercial enterprise. He was employed to transport road building or waste material from one point on the highway to another. So far as he was concerned, that was a carriage of property for a commercial purpose. If the trucks had, in fact, been operated by the department, then petitioners' contentions would be sound. Clearly, the building of a highway or bridge by a governmental agency is not a "commercial" purpose (*New York* v. *Graves,* 299 U. S. 401 [57 Sup. Ct. 269, 81 L. Ed. 306]), but that doctrine has no application to the activities of a trucker who is employed to transport some of the materials to be so used over the highways.

There is nothing in *Oswald* v. *Johnson,* 210 Cal. 321 [291 Pac. 579], heavily relied upon by petitioners, contrary to these views. That case involved the question as to whether certain contractors were liable for the gasoline tax imposed on fuel used in vehicles operated on the public highways. It was held that gasoline used in rollers and tractors used in the construction of a highway then not open to the public was not taxable. The court stated (p. 322):

"The Gasoline Tax Act was intended to provide for a license tax on motor vehicle fuel used on public highways of the state available for public travel and in aid of the construction, maintenance and repair of public highways. Obviously, it was not intended to require a license tax on motor fuel used exclusively on the right of way under construction.

"When, as here, the rollers and tractors are being used in such construction, the public highway is not being 'operated upon' in the sense intended by the statute. Practically this same question was presented to the Supreme Court of South Dakota in *Allen* v. *Jones*, 47 S. D. 603 [201 N. W. 353], where it was held that a traction engine while in use in the construction of a highway is not 'operated upon a highway' as contemplated by a Gasoline License Tax Act of that state, similar in effect to our own statute with regard to exemptions. *It is pertinently observed in that case, however, that motor fuel used in propelling tractors or trucks in the transportation of road building material or motor fuel to or from the site of construction is used in 'operation upon' the highways* and is not purchased subject to refund."

The problem involved in the instant case is very similar to the situation discussed in the italicized portion of the above quotation. The next contention of petitioners is that, assuming the contract called for the transportation of property for a commercial purpose by Entremont over the public highways, and therefore was superficially within the terms of the Highway Carriers' Act, the statute should be so construed as to render the transaction here involved as not within the statute. The reasons advanced are, first, that the state is not bound by its statutes unless expressly mentioned; and second, that the Public Utilities Act and the Civil Code indicate a legislative policy or intent to exempt transportation for the state from regulation, and to favor preferential charges to the state.

On this phase of the litigation we are satisfied with that portion of the first opinion prepared herein by Justice Langdon dealing with these two issues. (Cal.) [68 Pac. (2d) 964]. We therefore adopt as our conclusions thereon the following portions of that opinion:

█ "The first reason is obviously based upon an unsound assumption. The Department of Public Works was in this case only a shipper, with materials to be moved. Entremont

was the carrier. The statute does not cover shippers, but carriers, and the Commission's regulation was directed toward the carrier, and not toward the state. Accordingly the mere fact that Entremont was engaged in transportation for the state does not mean that the Commission was regulating a state agency.

"The second reason requires fuller consideration. Section 17(a)4 of the Public Utilities Act (Deering's Gen. Laws, Act 6386) provides that common carriers may transport persons or property 'free or at reduced rates' for the United States, state, county or municipal governments, where such free or reduced rate transportation is provided for in the contract. Section 17.5 of the Act makes the same provision where transportation is for contractors carrying out contracts with the United States, state or other governmental agency in this state. Section 2171 of the Civil Code provides: 'A common carrier must always give a preference in time, and may give a preference in price, to the United States and to this state.' These provisions permit preferential rates to governmental agencies such as the Department of Public Works, and there is nothing in the Highway Carriers' Act which attempts to prohibit such preferences. This has been recognized by the Commission in a number of instances in which reduced rates to the state or subdivisions have been approved.

"But though it is conceded that preferences to governmental agencies are authorized by the Public Utilities Act and not prohibited by the Highway Carriers' Act, it does not follow that any and every contract for a reduced rate is thereby rendered valid. The declaration of policy is not an absolute guarantee of preferences, and it does not determine questions of procedure. In this connection, an important section of the Highway Carriers' Act must be read. Section 11 of said act provides: 'If any highway carrier other than a common carrier desires to perform any transportation or accessorial service at a lesser rate than the minimum rates so established, the Railroad Commission shall, upon finding that the proposed rate is reasonable authorize such rates less than the minimum rates established in accordance with the provisions of section 10 hereof.' This section recognizes the possibility of valid preferential rates, and thereby supports and does not conflict with the declared policy in the above quoted provisions of the Public Utilities Act. But it adds a require-

ment for highway carriers which is not made in the case of common carriers, namely, a prior application to the Commission for authority to establish the rate; and it gives the Commission power to reject the proposed preference if it appears to create an unjust or unreasonable discrimination, against the public interest.

"In our opinion this section is clearly applicable to transactions with governmental agencies, and there is no reason for construing it otherwise. If it were not applied, preferences to such agencies would be entirely uncontrolled, with the consequent evils of unwarranted discrimination and price cutting by irresponsible carriers. The Commission was given authority to approve reasonable preferences, and its authority must be upheld. Competitive bidding is not prevented; it is still possible to the fullest extent, subject to the Commission's approval of the final bid, before the rate goes into effect. An instructive discussion of a similar authority of the Interstate Commerce Commission will be found in *United States* v. *Tennessee,* 262 U. S. 318 [43 Sup. Ct. 583, 67 L. Ed. 999]. See, also, *City of Hillsboro* v. *Public Service Com.,* 97 Or. 320 [187 Pac. 617, 192 Pac. 390], where the court held that service to municipalities was within the regulatory powers of the Commission.

"It is to be noted, also, that the requirement of prior application to the Commission follows logically from the nature of the regulatory provisions of the Highway Carriers' Act. Under the Public Utilities Act, carriers subject thereto establish their own rates by filing tariffs with the Commission, subject to the power of the Commission to change them for good cause. Doubtless such carriers, under the provisions of the act dealing with preferences, may themselves contract for preferential rates to governmental agencies, and the rates thus made will apply, subject to any later action by the Commission. Under the Highway Carriers' Act, perhaps because of the prior experience with large numbers of truckers who engaged in bitter competition at ruinously low rates, a system was established whereby the Commission itself fixes the original rates and approves all changes, before they go into effect. There is no logical reason why this prior approval should not be secured before any preferential rate is given. It is to be assumed that the Commission will act in accordance with the statutory declaration of policy in favor of preferences to the state, and, under section 11 of the Highway

Carriers' Act, will approve any requested preference unless the evidence shows that the particular preferential rate will constitute an unjust or unreasonable discrimination, and that the public interest will suffer thereby. The present proceeding, of course, does not involve any issue of abuse of discretion in the disapproval of a preferential rate.''

■ Both petitioners, and numerous *amici curiae,* have filed exhaustive briefs on the question of the constitutionality of the Highway Carriers' Act. It is urged that the regulation of the rates of private carriers is not cognate and germane to the regulation of common carriers, and that therefore the legislature was powerless to confer such power on the Railroad Commission. Substantially, the same arguments were advanced in challenging the constitutionality of the City Carriers' Act (Stats. 1935, chap. 312, p. 1057) as amended in 1937 (Stats. 1937, chap. 286, p. 629). In *Morel* v. *Railroad Com.,* 11 Cal. (2d) 488 [81 Pac. (2d) 144], all of these arguments were held to be unsound. No good reason exists for repeating the conclusions therein reached. Upon the authority of the Morel case it is concluded that the statute is constitutional.

For the reasons stated, we are of the opinion that the order of the respondent Railroad Commission should be, and it is hereby affirmed.

EDMONDS, J., Dissenting.—As I read the contract which is the basis of the controversy between the parties in this case, it provides for the rental of equipment and not for the transportation of property. If this is the correct construction of the instrument, then the petitioner is not subject to the commission's rate fixing power, for the relationship created by it is primarily determinative of the question for decision.

The contract did not, as the commission found, call for the use of Entremont's trucks for 500 hours each. The Department of Public Works was not bound to use his trucks for any length of time, for it expressly reserved the right to terminate the agreement "*at any time.* . . when the equipment is no longer needed" or "when state owned equipment is available". The contract, therefore, was not one for a specific transportation service, but was merely to make extra equipment available for emergency service or whenever state-owned trucks were not available.

Several other factors strongly indicate that it was a rental agreement. The rate of compensation was measured solely by the period of time during which the trucks were used and did not depend upon the use to which the trucks were put during that period. Although Entremont undoubtedly had the right to employ truck drivers of his own choosing, he was bound to replace anyone who was unsatisfactory to the department. However, with respect to the direction of trucking operations during the performance of the work under the agreement, the evidence unequivocally shows that Entremont neither possessed nor attempted to exercise any right of control.

Use and control of the hired property is the chief characteristic of a rental agreement. (Civ. Code, secs. 1925, 1955.) To say, as the commission found, that the trucks were subject to Entremont's control throughout the performance of the hauling and that the directions given to the operators by the foreman ''were only such as a carrier would normally have received from one for whom he is transporting property'' is in plain contradiction with the facts established at the hearing. The evidence introduced before the commission shows that the trucks were used in conjunction with those of the Department of Public Works for the purpose of clearing slides and filling washouts on the state highways during the winter season. In doing this work material was carried for distances varying from a few hundred feet to as much as eleven miles, depending upon the necessities of the occasion, and the operators of Entremont's trucks took orders solely from the foreman in charge of the highway maintenance crew, who gave them instructions where to load and unload. In short, during the time the Department of Public Works used the petitioner's equipment, they were a part of the fleet of trucks engaged in the repair work then being done, and no distinction was made between a privately owned unit and one belonging to the state.

It is true that the contract required Entremont to keep the trucks in repair and to pay for all supplies necessary for their operation and that it characterizes the operators as the employees of Entremont. However, it is common business practice to lease construction machinery ''including operation'', and such facts are in no way inconsistent with the theory of lease. In *Stewart* v. *California Imp. Co.*, 131 Cal.

125 [63 Pac. 177, 52 L. R. A. 205], the city of Oakland "hired the use of the street-roller outfit from the defendant company—to wit, the roller, engine, and the engineer to manage the same—for so much a day" and the court held that the "relation of master and servant existed between said defendant Conger, and not between the city of Oakland and defendant Conger". (See, also, *Billig* v. *Southern Pac. Co.*, 189 Cal. 477 [209 Pac. 241] ; *Lowell* v. *Harris*, 24 Cal. App. (2d) 70 [74 Pac. (2d) 551].) Nor is the fact that under the contract Entremont assumed liability for damage or injury to other property or persons inconsistent with a lease. It was competent for the parties to agree *inter se* upon the incidence of delictual responsibility and no doubt such a contract would be binding as between themselves.

Cases such as *Department of Water & Power* v. *Industrial Acc. Com.*, 220 Cal. 638 [32 Pac. (2d) 354], and *Independence Indemnity Co.* v. *Industrial Acc. Com.*, 203 Cal. 51 [262 Pac. 757], indicating that the department would be a "special employee" under the terms of the Workmen's Compensation Act, are not in point. The term "special employee" is a statutory relationship created by that act and is *sui generis*.

The case of *People* v. *Tedesco*, 18 Cal. App. (2d) 667 [64 Pac. (2d) 966], lends full support to the conclusion that Entremont was not engaged in the transportation of property upon the highways within the meaning of the Highway Carriers' Act. That case arose upon the sustaining of a demurrer to complaints brought by the state to recover penalties under the Highway Carriers' Act. The complaints alleged that the defendants had engaged in the transportation of property by motor vehicles for compensation in violation of the lawfully established rates for such service. By other allegations of the complaint it appeared that the defendants had hired out trucks of a specified capacity "with operators" to the United States government. The court held that the complaints failed to show that the defendants were "highway carriers".

*Holmes* v. *Railroad Com.*, 197 Cal. 627 [242 Pac. 486], is not contrary to a conclusion that the Entremont contract is a rental agreement. In that case the facts show "leases" between the parties which were a mere subterfuge, because it was apparent on the face of the contracts that the rate payable to the truck owners was based upon the weight of the

goods carried and not upon the period of time during which the truck was used. While the "rental" of each truck purported to be $19.50 per day, the court pointed out that "It is apparent from the other provisions of these 'leases' and from the manner in which they were performed by the parties that they are nothing more than contracts for the transportation of merchandise for compensation at the rate of thirty-two and one-half cents per hundred pounds, subject to a minimum charge of sixty-five cents per shipment." On the other hand, the rate of compensation payable to Entremont under his contract with the department was based solely upon the element of time of use and was in no way dependent upon the weight of the materials carried. The contract did not define either the time involved for performance or the route or *termini* the trucks were to follow.

In my judgment, a consideration of all of these elements, together with the fact that the direction and control of the operators during performance was vested in the department, compels the conclusion that the contract was a lease.

I am, therefore, of the opinion that the order of the Railroad Commission should be annulled.

Houser, J., concurred.

Rehearing denied.